Lou–Ease SIMMONS, on Behalf of Her Minor Children, Lucille SIMMONS, Robert Simmons, and Jason Simmons, Plaintiff,

v.

Herschel HOOKS, In His Official Capacity as Superintendent of Schools of the Augusta School District No. 10; The Board of Education of the Augusta School District No. 10, A Public Body Corporate; Gary Coles, James Allen Miller, Barbara Bowen, William Gregory, Sam Baker, William Trice, and Bay Fitzhugh, Individually and In Their Official Capacities as Members of the Board of Education of the Augusta School District No. 10, Defendants.

No. H–C–91–106.

United States District Court,
E.D. Arkansas, E.D.

Jan. 31, 1994.

John W. Walker, Little Rock, AR, for plaintiff.

Dan F. Bufford, Little Rock, AR, for defendants.

## MEMORANDUM OPINION
## AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

Before the Court is defendants' motion for judgment filed after the parties, by agreement, had submitted evidentiary depositions of expert testimony. The Court hereby denies the defendants' motion for judgment, as

the Court finds that resolution of the issues herein requires evidence from both plaintiff and defendants. This order constitutes the Court's findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

This action, which was tried to the Court in Little Rock, Arkansas, on April 26, 27, and 28, 1993, was brought pursuant to 42 U.S.C. § 1983 by plaintiff Lou–Ease Simmons on behalf of her minor children, who are black students in the Augusta School District. The defendants are the Board of Education of the Augusta School District No. 10, Herschel Hooks, Superintendent of said district, and board members Gary Coles, James Allen Miller, Barbara Bowen, William Gregory, Sam Baker, William Trice and Bay Fitzhugh. Plaintiff alleges that the defendants operate the school district in such a manner that the plaintiff's children have been subject to race discrimination and segregation, in violation of the Fourteenth Amendment, by the defendants through ability grouping and placement practices for special education, Chapter I, and gifted and talented classes. The plaintiff seeks injunctive and declaratory relief and damages. This Court has jurisdiction pursuant to 28 U.S.C. § 1343.

*Findings of Fact*

1. For the 1992–93 academic year the Augusta School District had an enrollment of 666 students, 56% of whom were black. The certified staff of the district was about 25% black. Augusta is the county seat of Woodruff County. The population of Augusta is approximately 47.8% black and 52% white. Seventy-one percent of the students in the Augusta School District are eligible for free and/or reduced meals.

2. The district began a system of ability grouping of students in 1970, shortly after termination of the dual, or segregated, school system in Augusta. The plaintiff, Lou–Ease Simmons, was a student in the system at that time and was placed in the low ability group and later in special education classes. She withdrew from school following the eighth or ninth grade.

3. The plaintiff has three children, Robert, Jason, and Lucille, who attend school in the district. The plaintiff is divorced from the children's father. The plaintiff testified that she did not read to her children or take them to the library.

a) Robert Simmons, at the time of trial, was enrolled in the eighth grade and has been a student in the special education program since he was in the fourth grade. For the 1992–93 academic year Robert participated in special education for two periods a day. In 1991 his mother met with school administrators in an effort to withdraw him from special education, but she changed her mind when Robert said that he wished to continue in special education.

Robert was born prematurely and is hearing impaired. His full-scale I.Q. is seventy-five; his verbal I.Q. is seventy-nine. Prior to his enrollment in kindergarten he spent about one month in the Head Start program at Augusta. His mother did not believe that the Head Start teacher was "doing her job" and removed him from the program. He was retained in kindergarten.

b) Jason Simmons, at the time of trial, was enrolled in the fourth grade. He was retained in kindergarten and was placed in special education at the end of the second grade. For the 1992–93 academic year Jason participated in special education for three thirty-minute periods per day and was in his regular classroom for four hours per day. Kindergarten was his first school experience, as Jason never participated in the Head Start Program. His full-scale I.Q. is eighty-one.

c) Lucille Simmons, at the time of trial, was enrolled in the seventh grade. She had always been placed in the "low" class until the 1992–93 school year, when she entered the high school, which does not currently practice ability grouping. During the 1992–93 academic year she participated in Chapter I programs in language and math. Like Jason, Lucille did not participate in Head Start prior to entering school.

4. The ability grouping that the district implemented separated the students into three homogeneous "ability" groups, (low, middle, and high) for each class. This is referred to as the "old policy." The district

had no written plan to monitor the effectiveness of this policy.

5. The "old policy" was changed to the "new policy" in May 1992 following the filing of the instant case in October 1991 and following the March 1992 election of four new board members to the seven-member board. The election was the result of a Voting Rights Act case challenging the way in which school board members were elected.

6. The new policy groups grades four through six into homogeneous groups for reading, math, and language arts. For other purposes these students are in heterogeneous groups.

Like the old policy, the new one continues to group kindergarten through third grade students homogeneously by class. The new policy actually represents no change from the old policy for these students. However, the new policy provides for heterogeneous grouping of grades kindergarten through three in two to three years. Superintendent Hooks testified that the board believed that it would disrupt the education process and cause confusion to abandon totally the homogeneous grouping and that the board elected instead to phase in heterogeneous grouping.

7. Kindergarten students are given standardized tests to determine their placement. Other students are placed by the principal on the basis of teacher recommendation, test scores, the last year's report card, and the principal's recommendation. (Plaintiff's Exh. 2.)

8. The lowest kindergarten group is called a pre-kindergarten class. These students matriculate into a regular kindergarten class the following year. Students who have attended kindergarten but who are determined not to be ready for first grade are placed in a "transitional" class.

9. Under both the old and new policies, all groups are taught by certified teachers. The course content for the high groups is more advanced and therefore more difficult. However, the course content for the low group is acceptable for that grade level. For example, the course content for the low group of third graders is appropriate for a third-grade class.

10. The low ability groups have a disproportionate number of black students. The percentage of black students in the low ability groups has been as follows in recent years: 1991–92, 72.1%; 1990–91, 80.9%; 1989–90, 76.6%; 1988–89, 81.6%; 1987–88, 75.9%; 1986–87, 72.5%. (Plaintiff's Exh. 14.)

11. Mr. Hooks and John James, the principal of the district's elementary school, testified that there are two schools of thought with respect to the educational advantages of ability grouping. The purported advantage of such grouping is that teaching and learning will be facilitated by instructing students of similar ability who progress at similar rates. However, the expert for the defendants, Dr. Kent Layton, testified that there are educational advantages to grouping for reading but did not testify that there are advantages to grouping entire classes of students on the basis of ability. Dr. Layton testified that he is generally opposed to standardized testing.

12. Dr. Layton testified that a quick review of recent yearbooks from the Augusta High School indicates that extracurricular activities and honors seem to be shared by students of both races.

13. The plaintiff's expert, Dr. Robert Slavin, testified that in his opinion ability grouping by class is not beneficial for any group and is harmful to the low group, as it stigmatizes those children, and would be particularly harmful to the low group if it were overwhelmingly black and the other groups were not. He testified that some experts are of the opinion that such grouping is slightly beneficial to the high group. He believes that all researchers in this area would be of the opinion that this type of ability grouping is not beneficial to students placed in the low group. He distinguishes grouping by class from the Joplin Plan, which groups students in a non-graded fashion for reading only so that an entire reading class is composed of students from different grades whose reading is on the same level. He testified that such a plan is beneficial to students, noting that they are heterogeneously grouped for all instruction except reading. He testified that plans such as the modified Joplin plan used

by the Augusta School District for grades four through six, in which students are grouped for reading, math, and english, have not been studied as extensively, but that the research "does not seem to support them in terms of student achievement." (Slavin Dep. at 53.)

14. Dr. Slavin also testified that he is of the opinion that the Peabody Picture Vocabulary Test, which is administered to entering kindergarten children by the district and which is used to determine placement, is as good as any available test. However, he stated that such standardized tests are suspected of having a serious cultural bias and that it is difficult to measure the ability of such young children.[1]

15. The district spends more money per student on those students who participate in special education than on students who do not participate.

16. The percentage of black special education students has been as follows in recent years: 1992–93, 62%; 1991–92, 62%; 1990–91, 61%; 1989–90, 69%; 1988–89, 67%; 1987–88, 63%. Arkansas has thirteen categories of students in special education. According to data supplied by the district, as of December 1, 1992, there were twenty-one students identified in the "MR" or "mental retardation" category. Of these, nineteen were black and two were white. In the category "SLD" or "Specific Learning Disabled" category, there were nineteen students, eight of whom were black and eleven of whom were white. Of the thirteen categories, ten had no students whatsoever. The defendants' expert, on cross examination, indicated that the absence of children in these other categories, as well as the over-representation of blacks, should be a concern. (Sydoriak Dep. at 143.)

17. The Arkansas Department of Education, in a letter dated November 1, 1988, notified Superintendent Hooks that the district's enrollment of blacks in special education exceeded a "standard deviation" (referring to the difference in percentage in special education and percentage of overall student population) of 8.3 and was "significantly higher than the district's overall percentages of minority students." (Defendant's Exh. 11.) This letter was based on special education enrollment as of December 1, 1987. The Department sent a similar letter to other school districts whose enrollment of minorities in special education exceeded the "standard deviation" of 8.3.[2] This was the first time the Department had sent such letters to Arkansas school districts. The letter requested the Augusta District to forward plans for the referral, evaluation, and placement of minority students in special education. The district forwarded its plans, which were subsequently approved by the Department. The Department evaluates districts in this regard at least every three years[3] and apparently has not sent the Augusta District such a letter since that time. However, the difference between the regular minority population and the special education minority population in the district increased in 1989–90 to 14.28 percent from 13.47 percent the year before. But for 1990–91 and thereafter the difference has been less than 8.3, according to the plaintiff's exhibits based upon data supplied by the defendants.[4]

18. The defendants' expert on special education, Dr. Diane Sydoriak, Associate Director of the Arkansas Department of Education, testified by deposition that the Department monitors each school district with respect to implementation of federal and

---

1. The Court notes that an exhibit proffered by the defendants after trial indicates that this test is normed for ethnicity. Because the defendants did not prove that this version of the test was administered to the Simmons children, the Court does not receive it as evidence.

2. The "standard deviation" is based upon Arkansas data.

3. Dr. Diane Sydoriak testified that when a district is out of compliance the Arkansas Department of Education follows up the following year.

4. The plaintiff pointed out in cross examination of Ms. DeVore that a defense exhibit (No. 16) showing the special education enrollment as of April 1993, indicates that the special education program has a black enrollment of 65.1%, while the student body is 55.1% according to enrollment figures that were taken on a different date. Because the Court does not know what the total district enrollment was (or the percentage black enrollment) in April 1993, the Court does not find these figures probative.

state requirements. The Department assists those districts identified as having an over-representation of minorities in special education and helps districts identify alternatives to special education, such as peer tutoring.

19. Special education is a program that is regulated by state and federal laws. There is a formal assessment of students by a multi-disciplinary team to determine each student's participation in special education. This assessment includes intellectual, academic, adaptive behavior, and language components, as well as evaluation of the work of the individual student and the teacher's recommendation. Special education is for children who have learning disabilities, not merely for children who are having difficulty in school. An individual education program must be developed for each special education student, and the school system must meet special education needs in the least restrictive environment necessary to serve the child's needs. Therefore, some special education students do not leave the regular classroom at all, while others might receive some special instruction in a "resource room."

20. Ms. Rowena DeVore serves as the special education supervisor for six school districts, including the Augusta School District. She testified that the Augusta District has adopted policies and procedures of the Arkansas Department of Education. She testified that most children in special education attend the special education classes only part of the day. For the elementary students, fifteen black students are in special education for a total of forty-seven periods of thirty minutes each. There are nine whites participating in twenty-five periods. In the high school, there are thirteen blacks and seven whites in twenty-nine and fourteen class periods respectively.

Ms. DeVore testified that the district followed the proper procedures in placing Jason Simmons in special education. Even though Jason's grades in regular classroom did not appear to be poor, they were based upon work that had been modified for him, as he was not able to perform at his grade level. Ms. Gwendolyn Stevenson, the elementary school counselor, and Tinka Simmons, Ja-

son's second-grade teacher, testified concerning the process of evaluating Jason and placing him in the special education program. His mother agreed to the placement. Ms. Simmons testified concerning measures she took to help Jason in her classroom prior to his placement in special education.

21. Like special education, the Chapter I program is regulated by state and federal laws. The percentage of black students in the Chapter I program was 68% in the 1992–93 academic year. The Simmons children have participated in Chapter I programs.

22. The percentage of black students in the gifted and talented program was 40% in 1992–93. This figure represents a substantial percentage increase over previous years and since the filing of this lawsuit. The percentage of black participation in previous years has been as follows: 1991–92, 30%; 1990–91, 25%; 1989–90, 16%; 1988–89, 17%; 1987–88, 13%.

23. Mrs. Joy Bowen, who directs the gifted and talented program for the Augusta School District, testified that gifted and talented students are selected by a committee from referrals made by teachers, parents, and the students themselves. More whites than blacks are referred. Mrs. Bowen has attempted with some success to increase referrals of black students and to promote the gifted and talented program to the black community. To aid in the identification of black gifted and talented students, the district added a non-linguistic test, the Raven, which has been normed on black students, according to Mrs. Bowen. The district has also conducted some inservice training to assist teachers in recognizing gifted and talented children.

*Conclusions of Law*

1. There is no precedent in the Eighth Circuit on the questions presented herein with respect to ability grouping. This Court will look to decisions in other circuits for guidance on this issue, even though those decisions are not binding precedents. It is clear that ability grouping *per se* is not constitutionally forbidden. *See, e.g., McNeal v. Tate County School District,* 508 F.2d 1017, 1020 (5th Cir.1975).

2. Ability grouping which results in racial segregation may be permitted in an otherwise unitary school system if the school district can demonstrate that its ability grouping is not based on the present results of past segregation or that it will remedy such results through better education opportunities. *Id.* *See also Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1414 (11th Cir.1985) (even if school system is not unitary, achievement grouping may be permitted).

3. The Augusta School District has been unitary since the termination of the dual system in 1971 in that blacks and whites have attended the same schools and, in high school, participate on a roughly equal basis in extracurricular activities. However, no court has ever found that the district is operating in a unitary manner.[5] Because the ability grouping policy implemented by the system since the termination of the dual system has resulted in the "low-achieving" classes having a much higher percentage of black students than the general student population, the Court cannot hold that the district has achieved unitary status with respect to classes. Because of the general uncertainty as to the legal definition of "unitary," and because the Court may reach a decision in this matter without a precise definition, the Court refuses to hold whether the Augusta School District has achieved unitary status.

4. If a school system has been declared unitary in a court action, the plaintiff alleging discrimination in a student assignment plan has the burden of proving that the school board acted with intent to discriminate in adopting the plan. *Price v. Austin Independent School District,* 945 F.2d 1307, 1313 (5th Cir.1991). This Court recognizes that the Augusta School District has never been declared unitary and therefore the Court need not apply this more burdensome standard to the plaintiff's case. However, the Court finds that the plaintiff has established by a preponderance of evidence that the Augusta School District intended to discriminate against black students when it adopted the ability grouping policy that be-

came effective at the same time the dual system terminated. The plaintiff's evidence, which the defendants have not rebutted, shows clearly that the implementation of the plan resulted in a continuation of racial segregation by class in the low ability groups.

5. Alternatively, the Court will assume that there has been no intentional discrimination. In accordance with *McNeal* and *Georgia State Conference* the Court must determine whether the ability grouping exercised under the "old policy" and continued under the "new policy" for kindergarten through third grade results in re-segregation of the races. The Court finds that it does with respect to the low group, whose class was 72.1% black in 1991–92 and had an even higher percentage of blacks in the immediately preceding five academic years.

a) Since this racial segregation occurs, the Court must inquire whether this segregation constitutes the present result of past discrimination. The Court finds by a preponderance of evidence that this segregation is the result of past discrimination. As previously noted, the ability grouping system was not instituted by the Augusta District until blacks and whites started attending the same schools. Therefore, in the low groups, the students whose parents had attended racially segregated schools, including the plaintiff's children, were themselves in classes that were racially identifiable.

b) Having found that the racial segregation in ability grouping is the present result of past segregation, the Court must determine whether the system of ability grouping will remedy the results of past segregation through better educational opportunities. The Court finds by a preponderance of evidence that it will not remedy such results. The plaintiff's expert testified that ability grouping stigmatizes those children placed in the low group. He could define no benefits to those children. Even the defendants' expert testified that he is generally opposed to standardized testing used by the defendants to group kindergarten children and could not present a credible educational justification

---

**5.** For a brief recognition of the difference between a "unitary" system and "unitary status" see *Georgia State Conference of NAACP v. Georgia,* 775 F.2d at 1413, n. 12.

for grouping entire classes of children for all purposes as opposed to grouping children within a class for activities such as reading.

6. The Court therefore finds that the old policy of ability grouping and the new policy, insofar as it groups by ability entire classes of children in kindergarten through third grade, violates the fourteenth amendment rights of black children placed in the low groups.

■ 7. The Court finds that the plaintiff has not established that the grouping under the so-called "modified Joplin Plan" is unconstitutionally segregative. The Court notes that under this plan the classes themselves are heterogeneously grouped and are grouped within classes for math, english, and reading. The plaintiff did not have much evidence on the segregative effects of this grouping, as it has only recently been implemented. However, the defendants' expert gave credible testimony that grouping for reading has educational benefits for all children. According to the plaintiff's expert, there is not much data concerning the effects of grouping such as that exercised under the "modified Joplin Plan."

8. The Court must make a similar analysis under *McNeal* and *Georgia State Conference* for the system used by the Augusta School District for placing children in special education. The Court finds that there has been no evidence of intentional discrimination with respect to placement of students in special education.

■ a) As a first step, the Court determines whether there is a segregation of students in this program. The Court finds that there is not. The defendants' expert testified that the procedures for placement in special education are dictated by federal and state regulations and that each school district is monitored by the Arkansas Department of Education. Even though this Court recognizes that state standards do not determine United States constitutional standards, this Court notes that the State of Arkansas, through its Department of Education, monitors the percentage of minority students in special education and has determined, through professional analysis, that Augusta's

percentage of blacks is within an acceptable range. Furthermore, the Court notes that these special education students, including Robert and Jason Simmons, are not absolutely segregated from other students. The Augusta district appears to be following the federal and state regulations which require that these students' needs be met within the least restrictive environment necessary.

■ b) Even if the placement of students in special education were found to have a segregative or discriminatory effect, the Court finds that special education programs, when operated in accordance with the guidelines described by Dr. Sydoriak, do not operate to continue the results of past discrimination. The special education programs are designed for children with identifiable learning disabilities, and the school districts that have an over-representation of minorities are directed to file plans designed to correct this. Augusta had such an over-representation, filed a plan to correct it, and has not been cited by the state since 1989. The Court finds that the plaintiff has failed to establish by a preponderance of evidence that the placement of students in the special education program at Augusta is constitutionally defective.

■ 9. Using the same analysis for the gifted and talented program, the Court finds that there has been no evidence of intentional discrimination by the district in the selection of students for this program. Even though there is evidence that this program has in the past had a segregative effect, the Court finds that its operation now is designed to overcome the effects of past segregation. The district now attempts to identify gifted and talented minority students, as indicated in the testimony of the Joy Bowen. Furthermore, the district has made substantial progress in increasing minority participation, which was 40% during the 1992–93 academic year. However, the Court finds that more likely than not the institution of the lawsuit served as a catalyst for the district to recruit and serve more black students in this program.

■ 10. The Chapter I program was the subject of less evidence than other programs

that have an allegedly segregative effect. The plaintiff did not establish that the defendants intentionally operate this program in a discriminatory manner. Even though proportionately more minorities are served in this program, the evidence shows that it is designed to help those students who are having difficulty achieving in specific academic areas and that these children are sometimes, but not always, pulled out of their classes for Chapter I instruction. Therefore, from the evidence available, the Court concludes that this program is designed to overcome the detrimental effects of past segregation and is therefore not violative of the constitutional rights of black children.

11. The Court finds that the constitutional rights of the Simmons children were violated by the defendants' policy to group young children into classes according to ability. However, the Court also finds that the poor academic performance of these children was caused by factors extraneous to the ability grouping, including Robert's premature birth and hearing impairment and the fact that Mrs. Simmons did not read to her children or have them participate in Head Start. Even though plaintiff has failed to show actual damages as a result of the defendants' ability grouping practices, the Court finds that plaintiff is entitled to recover nominal damages. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Tatum v. Houser,* 642 F.2d 253 (8th Cir.1981) (deprivation of certain constitutional rights, even without a showing of actual injury, may be vindicated, at a minimum, by making such actionable for nominal damages). The Court therefore awards plaintiff nominal damages of three dollars, one dollar for each child.

12. The Court hereby orders that the defendants cease operation of ability grouping by class beginning in the 1994–95 school year. This order does not extend to the "modified Joplin Plan" grouping used under the new plan for grades four through six. Judgment will be entered accordingly.