James YOUNG, Jr., a minor who sues by and through his father and next friend, James Young; Derrick Williams, a minor who sues by and through his father and next friend, Tommy Earl Williams, Sr.; and Rutland Smiley, a minor who sues by and through his father and next friend, Harold "Chip" Smiley, Plaintiffs,

v.

The MONTGOMERY COUNTY (ALABAMA) BOARD OF EDUCATION, et al., Defendants.

Civil Action No. CV–95–A–1459–N.

United States District Court, M.D. Alabama, Northern Division.

April 3, 1996.

Willie Troy Massey, W. Troy Massey, P.C., Montgomery, AL, Sandra Lewis, Montgomery, AL, for plaintiffs.

James R. Seale, Martha Ann Miller, Robison & Belser, P.A., Montgomery, AL, for defendants.

## MEMORANDUM OPINION

ALBRITTON, District Judge.

### I. INTRODUCTION

The Plaintiffs filed this lawsuit on November 13, 1995, challenging Policy IDFA, a rule adopted by the Montgomery County Board of Education ("Montgomery County BoE") on February 23, 1995. Policy IDFA requires all student athletes in Montgomery County who transfer schools under the Majority to Minority ("M to M") Transfer Program to sit out a year of interscholastic athletics. The Plaintiffs allege that policy IDFA discriminates against black students in Montgomery County in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964 ("Title VI"), and the regulations promulgated under Title VI. This court's jurisdiction is predicated upon 28 U.S.C. § 1331.

On the day the Plaintiffs filed their Complaint, they also filed a Motion for a Preliminary Injunction to prohibit the Defendants from enforcing Policy IDFA during the pendency of this litigation. The Defendants opposed the motion, arguing that Policy IDFA is legitimate and non-discriminatory and was adopted to thwart the illicit recruiting of athletes by coaches in the Montgomery County school system. The court conducted a hearing on the motion between November 22, 1995 and December 15, 1995. At the hearing, both the Plaintiffs and the Defen-

dants presented witnesses and introduced exhibits bearing on the Montgomery County BoE's intentions in adopting Policy IDFA and on the effects of the policy upon students in Montgomery County.

On December 1, 1995, after the Plaintiffs had finished presenting their evidence, the court issued an order temporarily restraining the Defendants from enforcing Policy IDFA against the named Plaintiffs until the Motion for a Preliminary Injunction was decided. The hearing resumed on December 15, 1995, and the Defendants finished presenting evidence relating to the motion. At the conclusion of the hearing—and after balancing the danger of irreparable injury to the Plaintiffs against the absence of injury to the Defendants and the public—the court granted the Plaintiffs' Motion for a Preliminary Injunction pending a trial of the case on the merits.

On March 5, 1996, the court conducted a bench trial on the merits of the case. The testimony of the witnesses and the exhibits introduced by both the Plaintiffs and the Defendants at the hearing on the Motion for a Preliminary Injunction were incorporated as evidence in the trial by agreement of the parties. Both the Plaintiffs and the Defendants were given the opportunity to introduce additional evidence. The Plaintiffs rested their case upon the evidence presented at the prior hearing. The Defendants presented some additional evidence. At the conclusion of the trial, both parties were given time to file briefs arguing the merits of the case.

After consideration of the testimony of the witnesses, the exhibits, and the briefs of the parties, the court makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

### A. Background

Policy IDFA only affects students who transfer schools under the Majority to Mi-

nority ("M to M") Transfer Program. The M to M program allows any student in the Montgomery County school system who is zoned for a school where his race is in the majority to transfer to a school where his race is in the minority.[1] The M to M program, with some modifications, has been in effect in Montgomery County since 1970. Historically, students employing the M to M program have been almost exclusively black, although some white students have employed the program.[2]

The original purpose of the M to M program was to aid in eliminating racial segregation in the Montgomery County school system. When the program was first implemented, the Montgomery County BoE was under the jurisdiction of this court because it was operating a racially segregated school system. See Carr v. Montgomery County Bd. of Educ., 377 F.Supp. 1123, 1125 (M.D.Ala.1974) (Civ.A. No. 64–2072–N; filed in May 1964). The M to M program was employed as part of the court-ordered school desegregation effort.

On May 28, 1993, this court declared that the Montgomery County BoE had achieved a unitary school system and released the BoE from the court's jurisdiction. See Carr v. Montgomery County Bd. of Educ., Civ.A. No. 64–2072 (M.D.Ala. May 28, 1993) (order dismissing case). Dismissal of the Montgomery County school desegregation case, however, did not mean the end of the M to M program. Prior to dismissal of the case, the Montgomery County BoE had adopted a resolution stating that the M to M program would continue "subject to any recommendation the Superintendent may make as to the manner in which the program operates." See Res. of Montgomery County Bd. of Educ. (May 26, 1995). Pursuant to this resolution, the M to M program still exists today, but it is no longer a court-ordered program. In-

---

**1.** There are five high schools in Montgomery County: George Washington Carver High School, Jefferson Davis High School, Sidney Lanier High School, Robert E. Lee High School, and Montgomery County High School. Although Jefferson Davis High School was majority white in the Spring of 1995, it became majority black during the 1995–96 school term. Robert E. Lee High School is currently the only majority white high school in Montgomery County. The M to M Transfer Program also applies to the elementary and junior high schools in Montgomery County.

**2.** Approximately 1800 to 2000 students per year use the M to M program in the elementary, junior high and senior high schools of Montgomery County.

stead, it is a voluntary program maintained by the Montgomery County BoE to assist in preserving the unitary status of the school system.

## B. *Athletic Recruiting*

Policy IDFA, an amendment to the M to M Transfer Program, evolved in response to concerns that the M to M program was being used to facilitate athletic recruiting in the Montgomery County school system. Although no case of illegal recruiting in Montgomery County has ever been proven, numerous informal complaints alleging recruiting violations have been lodged with the Montgomery County BoE in recent years.

In substance, the complaints alleged that football and basketball coaches and others from high schools on the east side of Montgomery have encouraged talented athletes from the west side to transfer schools under the M to M program. Historically, the east side schools were majority white schools, while those on the west side were majority black. Many of these athletes were attracted to the athletic programs of the east side schools because in the past the programs tended to be, or were perceived as being, more successful and better funded, and the athletes received more attention from college scouts than the athletes from the west side schools. During the trial of this case, the allegations of illicit recruiting were confirmed by several student athletes from the west side of Montgomery who testified that they had been approached by coaches and others from east side schools and asked to consider transferring under the M to M program.

It is uncontested in this case that athletic recruiting at the high school level has detrimental effects upon individual students. Foremost, athletic recruiting harms a student's character development by de-emphasizing the academic and civic objectives of the educational system. The principal objectives of the Montgomery County school system are to teach students academic fundamentals and to prepare them to be productive, law-abiding citizens. While athletics certainly play an important role in a student's character development, athletic recruiting places undue emphasis on athletic achievement as an end in itself instead of as a means by which a person can develop the characteristics necessary for success in life.

Athletic recruiting can also have detrimental effects upon an entire school. By drawing away top athletes, recruiting can deprive a school of student leaders and positive role models. Recruiting can also diminish school spirit and community support. During the trial of this case, the Defendants presented testimony that athletic recruiting has hampered the success of the football and basketball programs of Montgomery's west side schools. This has tempered school spirit among students and community members, which in turn may have an effect upon student attendance. Furthermore, in some schools, recruiting affects the budget for interscholastic sports. The Defendants presented testimony in this case that during successful seasons the west side schools derive substantial revenue from attendance at football and basketball games. These funds are used to subsidize unprofitable team sports, such as soccer and tennis. During unsuccessful seasons, the schools are forced to reduce travel expenditures and new equipment purchases.[3]

## C. *Policy IDFA*

To combat the problem of illicit recruiting, Montgomery County Board of Education members Buddy Brendle and Henry Spears resolved to modify the M to M Transfer Program. In October 1994, Buddy Brendle proposed a version of Policy IDFA that would only apply to senior high school athletes. Henry Spears later proposed a version of Policy IDFA that would apply to all students in the Montgomery County school system. This version was adopted unani-

---

**3.** During the 1994–95 football season, Sidney Lanier High School received approximately $22,-000 in revenue from ticket sales. After that season, Policy IDFA went into effect. During the 1995–96 season, Lanier High School had a higher than usual number of tenth grade students playing on the football team. As a result, not as many players had to play on both offense and defense as before, and the team had greater success. Ticket revenue increased to more than $59,000.

mously by the Board of Education on February 23, 1995. Policy IDFA states:

> In the event any student engaged in athletics at any school within the Montgomery County School System shall hereinafter request a transfer under the Majority-to-Minority Transfer Program to a school which he or she is not otherwise zoned, such student shall be disqualified from participating in athletics for the next school year. This policy shall apply to any elementary school student, any junior high student, or any senior high student who qualifies for, and is granted, a requested Majority-to-Minority transfer.

When Policy IDFA was adopted, the Board of Education was comprised of eight members, three of whom were black, including Henry Spears. The Board members, all Defendants in this case, admit that they were aware that Policy IDFA itself would almost exclusively affect black students.[4] Spears testified, however, that the Board's purpose in passing Policy IDFA was to arrest the decline of the west side schools and to enable them to compete with the east side schools. Buddy Brendle testified that he hoped Policy IDFA would help attract whites back to the school system and that he was surprised that black board members voted for the proposal. He also testified, however, that the primary purpose of Policy IDFA was to revive the west side schools.

The substantive provisions of Policy IDFA were chosen by the Board of Education because they comply with the rules of the Alabama High School Athletic Association ("AHSAA"). Under the rules of the AHSAA, a student who transfers to a new school must sit out a year of eligibility. This rule supplements the investigatorial powers of the AHSAA, which have not proven effective in eliminating athletic recruiting. In the past, the AHSAA exempted Montgomery County from the transfer rule to avoid interfering with the court order that imposed the M to M Transfer Program. Now that M to M is a voluntary program, it is unclear whether the AHSAA would apply their rule to Montgomery County in the absence of Policy IDFA.

### D. *The Plaintiffs' Case*

In this case, all of the Plaintiffs are black students who have been affected by Policy IDFA. During the 1995–96 school year, they are all zoned to attend one of Montgomery's west side high schools, but they are all attending one of the east side high schools under the M to M program. James Young, Jr. and Derrick Williams are basketball players, and Rutland Smiley is a football player. As a result of policy IDFA, the Montgomery County BoE informed all of the Plaintiffs that they would not be allowed to practice or play during the 1995–96 school year. There have been no allegations, however, that any of the Plaintiffs were recruited to transfer schools.

The Plaintiffs claim that policy IDFA discriminates against them based on race in violation of the Equal Protection Clause of the Fourteenth Amendment and in violation of Title VI of the Civil Rights Act of 1964. They also claim that Policy IDFA violates the regulations promulgated under Title VI because it disparately impacts black students. *See* 34 C.F.R. 100.3(b)(2). They point out that the Montgomery County school system is subject to Title VI because it receives millions of dollars in federal assistance every year.

### III. *CONCLUSIONS OF LAW*

#### A. *Intentional Discrimination*

■ The Plaintiffs allege that policy IDFA violates the Equal Protection Clause of the Fourteenth Amendment[5] and Title VI of the Civil Rights Act of 1964[6] because it discrimi-

---

**4.** During the 1994–95 school year, 2,147 senior and junior high school students participated in interscholastic athletics in Montgomery County. 44 athletes used the M to M Transfer Program. They were all black students.

**5.** The Equal Protection Clause of the Fourteenth Amendment provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**6.** Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Montgomery

nates against them based on race. To demonstrate a violation of either the Equal Protection Clause or Title VI, the Plaintiffs must show intentional discrimination. *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir.1993); *see also Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 715, 83 L.Ed.2d 661 (1985) ("Title VI itself directly reache[s] only instances of intentional discrimination."); *Guardians Assoc. v. Civil Serv. Comm'n,* 463 U.S. 582, 610, 103 S.Ct. 3221, 3236, 77 L.Ed.2d 866 (1983) (Powell, J. concurring, joined by Burger, C.J. and Rehnquist, J.) (Title VI requires intentional discrimination); *Guardians,* 463 U.S. at 617, 103 S.Ct. at 3240 (O'Connor, J. concurring) (same); *Bd. of Educ. v. Harris,* 444 U.S. 130, 160, 100 S.Ct. 363, 379, 62 L.Ed.2d 275 (1979) (same); *Washington v. Davis,* 426 U.S. 229, 238–248, 96 S.Ct. 2040, 2046–2051, 48 L.Ed.2d 597 (1976) (showing of a disparate racial impact insufficient to prove violation of Equal Protection Clause).

■ In this case, the Plaintiffs have not established that the Montgomery County Board of Education intended to discriminate against black students by adopting Policy IDFA. In fact, the great weight of the evidence is to the contrary. Three of the eight members of the board that approved Policy IDFA are black, including Henry Spears, the member who proposed the final version. Moreover, the Defendants' testimony clearly showed that the Board's aim in adopting Policy IDFA was twofold—to address the compelling problem of illegal recruiting and to revive Montgomery's west side schools.

Although there is no question that the board members knew that Policy IDFA would disparately impact black student athletes, their knowledge of the disparate impact is not enough to prove that they intended to discriminate based on race, especially in light of their clear intent to benefit the predominantly black schools of west Montgomery. Additionally, the fact that Buddy Brendle admitted that he was surprised black board members voted for Policy IDFA and that he hoped Policy IDFA would attract white students back to the school system does not indicate that he possessed a dis-

County school system is subject to Title VI be-

criminatory intent, and it certainly does not indicate that the entire Board of Education possessed such an intent. Accordingly, the Plaintiffs' claims based on intentional discrimination under the Equal Protection Clause and under Title VI must fail.

### B. *Disparate Impact*

Even though Title VI itself bars only intentional discrimination, the regulations promulgated pursuant to Title VI proscribe some actions that merely have a disparate impact on groups protected by the statute. *See* 34 C.F.R. § 100.3(b)(2); *see also Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. at 3223 n. 2; *Alexander,* 469 U.S. at 292–94, 105 S.Ct. at 715–716 ("[A]ctions having an unjustifiable disparate impact on minorities could be redressed through agency regulations...."); *Georgia State Conference v. State of Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985). 34 C.F.R. § 100.3(b)(2) provides that:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2).

■ The elements of a Title VI disparate impact claim under 34 C.F.R. § 100.3(b)(2) derive from cases decided under Title VII. *See Georgia State Conference,* 775 F.2d at 1417; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Initially, a plaintiff must show by a preponderance of the evidence that a facially neutral educational practice

cause it receives federal financial assistance.

has a racially disproportionate adverse effect. *See Georgia State Conference*, 775 F.2d at 1417. If the plaintiff makes such a showing, the burden shifts to the defendant to prove a substantial legitimate justification for the practice. *Id.* Should the defendant prove a valid justification, the plaintiff may still prevail by proffering an equally effective alternative practice which results in less racial disproportionality or by presenting evidence that the legitimate practice is a pretext for discrimination. *See Id.*

### 1. *Racially Disproportionate Adverse Effect*

■ In this case, the parties do not dispute that Policy IDFA itself has a disproportionate adverse effect upon black student athletes. This conclusion, however, does not complete the court's initial inquiry. Policy IDFA does not exist in a vacuum, and it is not a free-standing policy. It is merely an amendment to the M to M Transfer Program, and it applies only to those students who elect to employ the program. Divorced· from the M to M program, Policy IDFA has no effect upon any students in Montgomery County. Thus, Policy IDFA—and its effects—cannot be viewed in isolation. The policy must be viewed in conjunction with the other provisions of the M to M program to determine if the Board of Education's rule requiring students who use the M to M program to lose a year of eligibility in interscholastic sports has a racially disproportionate adverse effect.

In light of this broad view of the Board's practices, the court concludes that the Plaintiffs are unable to demonstrate that the Board's rule has a racially disproportionate adverse effect. As a result, they cannot prevail on their disparate impact claim. *Elston,* 997 F.2d at 1407 (showing of adverse disproportionate effect required); *Groves v. Alabama State Bd. of Educ.,* 776 F.Supp. 1518, 1523 (M.D.Ala.1991) (same).

To explain this conclusion, the court must review the history of the M to M Transfer Program. From 1970 until 1993, students in Montgomery County who were zoned to attend a school where they were in the majority held a legal right to transfer to a school in which they were a minority under the M to M program. This was one of the tools used by the court, by the authority of the Equal Protection Clause of the Fourteenth Amendment, to remedy past racial discrimination in the school system. *See Carr v. Montgomery County Bd. of Educ.,* 377 F.Supp. 1123, 1125 (M.D.Ala.1974). Historically, the right to transfer under the M to M program was exercised almost exclusively by black students who were zoned to attend one of the predominantly black schools of west Montgomery, but who wanted to transfer to one of the predominantly white schools in east Montgomery.

The status of the M to M program changed, however, in 1993. In that year, this court found that the Montgomery County Board of Education had successfully met its constitutional responsibility to dismantle the segregated system and declared the Montgomery County school system unitary. *See Carr v. Montgomery County Bd. of Educ.,* Civ.A. No. 64–2072 (M.D.Ala. May 28, 1993) (order dismissing case). Once desegregation was successfully achieved, no lawful basis for federal control of the schools remained, and the system was returned to local control. Thereafter, students in Montgomery no longer possessed a right to transfer schools, because the effects of past discrimination in the school system had been eradicated. The Board of Education, however, voluntarily chose to retain the program to aid in preserving the unitary status of the school system. As a result, students today can still transfer schools under the M to M program, but they do so now as a privilege, instead of as a right.

By adopting Policy IDFA in February 1995, the Board of Education retracted a portion of the transfer privilege by requiring those who choose to use the M to M program do so at a cost—one year of eligibility in interscholastic sports. In this case, the crux of the Plaintiffs' argument is that this cost is disproportionately sustained by black students because the vast majority of students who use the M to M program are black.

This isolated view of Policy IDFA, however, ignores the fact that the M to M program is a privilege that students freely elect to

exercise. No students have a right to transfer schools, but under the M to M program, they have the option of transferring, subject to losing a year of eligibility in interscholastic sports. No student is required to make such a choice, and all students possess the option of remaining in their zoned school where they can participate in interscholastic sports without restriction. Furthermore, the one year restriction on athletic eligibility is no more than the long-standing rule which the Alabama High School Athletic Association applies to transfer students of all races throughout Alabama. With these facts in mind, it is clear that Policy IDFA only disproportionately affects black students by virtue of the fact that black students disproportionately exercise the privilege of using the M to M program.

Additionally, any adverse effect that Policy IDFA itself has on individual black students is offset by the fact that the educational advantages of preventing athletic recruiting in Montgomery County will accrue primarily to the benefit of the students in Montgomery's predominantly black west side schools. These students have suffered the consequences of athletic recruiting in Montgomery County because most of the students targeted for recruiting have been black students from the west side.

Therefore, it is clear that the Montgomery County Board of Education's practices regarding student transfers under the M to M program do not have a disproportionate adverse impact on black students. If anything, the evidence in this case demonstrates that the Board's practices regarding school transfers have a disproportionate *beneficial* impact on black students. Just because Policy IDFA reduces the benefit for black athletes wishing to transfer does not mean that the option is no longer a benefit. Accordingly, the Plaintiffs' disparate impact claim based on the regulations promulgated pursuant to Title VI must fail.

### 2. *Substantial Legitimate Justification*

█ Even if the Plaintiffs in this case were able to demonstrate that the Board of Education's practices have a racially disproportionate adverse effect, the Defendants would nevertheless prevail in this case be-cause they have established a substantial legitimate justification for Policy IDFA. *See Georgia State Conference*, 775 F.2d at 1417.

During the trial of this case, the Defendants presented evidence that Policy IDFA was adopted to address concerns that the M to M Transfer Program was being used to facilitate athletic recruiting in the Montgomery County school system and to help revitalize Montgomery's west side high schools. Both of these justifications are substantial and legitimate because they evince a genuine attempt by the Board of Education to improve the quality of the education offered in Montgomery County.

As the evidence in this case has shown, athletic recruiting at the high school level has detrimental effects upon individual students and schools. It interferes with individual character development, deprives schools of student leaders and role models, and, for some students, it may even affect school attendance. Furthermore, athletic recruiting diminishes school spirit and community support, hinders the success of football and basketball programs, and reduces funds available for all sports teams. As a result, it is clear that Policy IDFA has legitimate educational justifications.

Although it is unfortunate that some black student athletes who have not been the subject of illicit recruiting attempts may be discouraged from using the M to M program by Policy IDFA, the Plaintiffs have failed to demonstrate the existence of an equally effective alternative practice which would avoid such a result. The only alternative practice that has been suggested to address athletic recruiting is the grievance and investigation procedures of the Alabama High School Athletic Association. These procedures, however, have been in effect for years and, as demonstrated by the testimony in this case, have proven ineffective at preventing recruiting. Even though testimony suggested that recruiting in Montgomery, either overt or subtle, appears to be commonplace, very few formal complaints have been filed with the AHSAA. The deficiencies in these procedures as a preventive measure are obvious. Students who are recruited are loath to admit it, and other students who are not successfully recruited are often reluctant to come forward. Accordingly, this court con-

cludes that the Defendants have established a substantial, legitimate justification for Policy IDFA.

## IV. *CONCLUSION*

The court finds form the evidence presented that there was no intention on the part of the Montgomery County Board of Education to discriminate on the basis of race when it adopted Policy IDFA. The Board was fulfilling its responsibility to provide the best possible education to the school children of this county. Furthermore, if there is a racial impact from the policy, it is more of a benefit to black students than a detriment. The effect of the policy is to strengthen the athletic programs at schools on the predominantly black west side of Montgomery. This ultimately results in strengthening the overall educational opportunities and experiences of all students in those schools. The detriment that is faced by individual black student athletes who would prefer to leave the west side for schools on the east side without losing a year of eligibility is the same detriment faced by transferring student athletes of all races throughout Alabama under the rules of the Alabama High School Athletic Association. This detriment is greatly offset by Policy IDFA's benefits.

For the foregoing reasons, the court finds that Policy IDFA is not racially discriminatory and does not violate the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), or the regulations promulgated under Title VI.

A separate Order will be entered in accordance with this Memorandum Opinion.

## *ORDER*

In accordance with the Memorandum Opinion entered on this day, it is hereby Considered, Ordered and Adjudged as follows:

1. The court finds the issues in favor of the Defendants and against the Plaintiffs and denies all relief requested by the Plaintiffs.

2. Costs are taxed against the Plaintiffs.